**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

WILLIAM THOMPSON,          )     CASE NO.  4:09-cv-0649
                                         )
           Plaintiff,          )
                                         )     MAGISTRATE JUDGE VECCHIARELLI
           v.             )
                                         )
MICHAEL J. ASTRUE,         )
    Commissioner of Social Security,     )     **MEMORANDUM OPINION & ORDER**
                                         )
           Defendant.

      Claimant, William Thompson ("Thompson"), challenges the final decision of the Commissioner of Social Security ("Commissioner"), denying Thompson's applications for a period of Disability Insurance Benefits ("DIB") under Title II Of the Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 423 and 42 U.S.C. § 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

      For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I.  Procedural History

Thompson filed his applications for DIB and SSI on December 4, 2004 alleging disability beginning April 30, 2004.[1]  His applications were denied initially and upon reconsideration.  Thompson timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Douglas Cohen, held a hearing on December 21, 2006, at which Thompson, who was not represented by counsel, and Charles Cohen, vocational expert ("VE") testified.  The ALJ issued a decision on April 12, 2007, in which he determined that Thompson was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Thompson filed an appeal to this Court.

On appeal, Thompson claims the ALJ erred by: (1) failing to properly evaluate Thompson's credibility; and (2) failing to properly evaluate the VE's testimony in determining that Thompson could perform the work of a cashier or guard.  The Commissioner disputes Thompson's claim.

## II.  Evidence

### A.  Personal and Vocational Evidence

Thompson was born on March 14, 1958.  He was 49 years old at the time of his hearing.  (Transcript ("Tr.") 24).  Thompson completed the eighth grade.  He does not

---

[1] Plaintiff had previously applied for benefits on August 27, 2002.  On April 30, 2004 plaintiff was awarded benefits for the closed period from August 14, 2002 through December 3, 2003, when Plaintiff was medically determined to be able to return to work. (Tr. 18, 34-39). The ALJ decision at issue in this case addresses the period beginning April 30, 2004.

have a GED.  Thompson cannot read or write, but he can add and subtract.  (Tr. 185-186).  Thompson has past relevant work as a roofer, as well as a salesman, boss, and carrier in his own roofing company.  (Tr. 203).

### B. Medical Evidence

On August 13, 2002, Thompson fell off a roof onto an asphalt surface.  (Tr. 110).  Thompson suffered multiple traumas including:  a right olecranon (elbow) fracture; a right acetabular (pelvis) fracture; injuries to his ankle, knee, wrist, and scapula; and a laceration of his left hand.  (Tr. 153).  Thompson underwent an open reduction internal fixation of the olecranon fracture.  The acetabular fracture was nonoperative.  (Tr. 91).  After surgery, Thompson was transferred to the hospital floor in stable condition and started on anticoagulants.  (Tr. 91).  Thompson was discharged from the hospital on August 19, 2002.  (Tr. 91).

In September 2002, Thompson presented to Dr. Lowery.  Dr. Lowery noted that Thompson was being treated with anticoagulation therapy and extensive rehabilitation therapy for his pelvis and elbow injuries.  Dr. Lowery opined that Thompson would likely be unable to work for a year from the date of his injuries.  (Tr. 36).

In October 2002, Dr. Lowery noted that Thompson was only partially weight bearing, and he again opined that Thompson would likely be unable to work for a year.  (Tr. 36).

On November 21, 2003, Dr. Noel reported that although Thompson would have permanent limitations secondary to his pelvis and right elbow injuries, Thompson was released to return to work as of December 3, 2003.  (Tr. 36).

On October 27, 2004, Thompson presented to Dr. Flanagan.  Dr. Flanagan

3

reported that Thompson had good range of motion in his shoulder, despite a snapping scapula. Thompson had decreased elbow extension and occasional painful popping. His wrist was stiff, and the incision on his left hand caused him problems. Thompson reported achy pain in his hip and back, especially when he was up for too long. Dr. Flanagan opined that Thompson was doing well and still trying to, "plug along as best he can." Dr. Flanagan prescribed anti-inflammatory drugs. Thompson reported that he did not want to be on disability, but there were no jobs available for him at the time. (Tr. 153).

On January 19, 2005, Dr. Casey, completed a disability report. Dr. Casey opined that, "Mr. Thompson's physical limitations coupled with his learning deficits and disabilities have made it impossible to pursue any substantial gainful activity in term of employment." (Tr. 142).

On February 8, 2005, Dr Gordon performed muscle strength and range of motion testing on Thompson which revealed decreased ranges in Thompson's right elbow extension and flexion, right hip flexion, and right shoulder abduction. (Tr. 143-146). Also on February 8, 2005, Thompson underwent diagnostic imaging of his right hip that revealed bony hypertrophy and joint space narrowing slightly greater and asymmetric compared to the left hip. (Tr. 147).

On February 9, 2005, Thompson presented to Dr. Flanagan for follow up. Dr. Flanagan noted Thompson had good range of motion throughout his elbow, but he was still able to make his scapula snap. Thompson continued to have right wrist clicking and popping that caused him pain. He had hip pain, ankle pain, and occasionally had clicking in his knee. X-rays taken that day of Thompson's elbow and wrist showed his

4

wrist carpal bones had maintained their proper alignment and spacing; his elbow showed prominent hardware and a healed fracture.  (Tr. 151).

On February 15, 2005, Dr. Gordon performed a consultive examination of Thompson.  Physical examination revealed abnormal range of motion of the upper and lower extremities and abnormal range of motion of the spine.  Thompson had weakness of the right elbow but otherwise had very good grip bilaterally.  Thompson limped on his right leg and had a mild decrease in motion of the right hip.  Dr. Gordon opined that Thompson could do a limited amount of work-related physical activity.  Specifically, he could sit, stand, and walk, although Thompson claimed walking tired him after 100-200 feet.  He could lift and carry normally with his left hand but should not carry more than 10 pounds with his right arm due to decreased strength in his right elbow.  He could otherwise handle objects.  Thompson had no mental impairments.  (Tr. 157).

On March 1, 2005, Dr. Caldwell completed a residual functional capacity ("RFC") assessment of Thompson.  (Tr. 158-165).  Dr. Caldwell opined that Thompson could lift 20 pounds occasionally and 10 pounds frequently.  He could sit, stand, and walk for six hours out of an eight hour workday.  He could never balance.  He could only occasionally reach on the right side due to his right elbow replacement.  Dr. Caldwell noted no other limitations.  (Tr. 158-165).

On April 21, 2005, state agency physician Anton Freihofer affirmed Dr. Caldwell's findings.  (Tr. 165).

On August 3, 2005, Thompson presented to Dr. Flanagan for follow up. Thompson reported that he had been doing well, but had occasional pain after walking for a while.  Thompson denied any acute pain.  He reported minimal discomfort in his

5

right hip and right elbow, especially with increased activity and range of motion.  He had occasional shooting pain down his right leg.  Dr. Flanagan opined that Thompson was doing fairly well .  He continued Thompson on anti-inflammatories and advised Thompson to return for follow-up in six months.  (Tr. 169).

On April 14, 2006, Thompson presented to Dr. Flanagan for follow-up.  (Tr. 167).  Thompson reported that the pain on his right side has been getting worse and causing him to lose sleep.  Thompson was taking virtually no narcotic pain medication, but was taking anti-inflammatories.  Dr. Flanagan noted that Thompson has degenerative arthritis in his right shoulder and scapula, right elbow, right wrist, right hip, right knee, and right ankle.  Physical examination revealed a snapping scapula and crepitus on the right side, but good range of motion in the shoulder.  Thompson was lacking some extension in the right elbow.  He had some limited range of motion in his hip, and hip X-rays showed some degenerative arthritis but no real acute interval changes.  Thompson was assessed with post traumatic degenerative arthritis.  Dr. Flanagan opined that Thompson's arthritis limited him from any strenuous or meaningful employment.  Dr. Flanagan gave Thompson Naprosyn and a prescribed Darvocet for break through pain.  He advised Thompson to follow-up in six months.  (Tr. 167).

On September 1, 2006, Thompson presented to Dr. Flanagan for follow up.  Thompson reported that he had no new complaints except that he was beginning to develop left hip and knee pain that he attributed to overcompensating for his arthritis on the right side.  Upon examination, Thompson had good range of motion in his left knee and hip with no crepitus or effusion.  (Tr. 166).

**C.  Hearing Testimony**

6

Thompson appeared at the hearing without counsel.  He was advised of his right to be represented by counsel or another representative, but he chose to proceed by himself.  (Tr. 180-183).  Thompson testified that he completed the eighth grade and had not obtain a GED.  (185).  He cannot read, and while he can write, he cannot spell.  (Tr. 185).  Thompson can add and subtract.  (Tr. 185).

Thompson worked as a roofer until he fell from a roof in 2002.  (Tr. 186). Thompson testified that his biggest problems remain his right shoulder and right elbow, however, his left leg, pelvis, and back also bother him.  (Tr. 189).  Thompson stated that standing or sitting for more than a half hour bothered him, and that if he were sitting for more than a half hour, he would have to get up and move around.  (Tr. 193-194).  He can walk for about a half hour or a half a mile.  (Tr. 197).  Thompson experiences increased pain, stiffness, and swelling in his pelvis, knee, and ankle throughout the day. (Tr. 192).

Thompson testified that he has rotation and lifting problems with his right shoulder.  (Tr. 196).  He stopped lifting his grandson when he reached 20 pounds.  (Tr. 196).  He cannot lift with his right hand; he uses his left hand if he needs to lift.  (Tr. 196).

Thompson testified that his left hand was cut to the bone when he fell, and that he continues to suffer pain as a result of scar tissue.  He cannot use a cane because he cannot push down with his left hand, and his right arm is not strong enough.  (Tr. 194).

Thompson testified that he runs the vacuum, washes dishes, and takes out the trash.  He tries to use a push mower and a riding mower, as well as cut fire wood, but he can only engage in these activities for about a half hour before needing a break.

7

(Tr. 200-201).

The VE testified that Thompson's past work as a roofing contractor is medium skilled work, but because of his wife's assistance with the business, the skills are not transferrable.  (Tr. 204).

The ALJ asked the VE to consider an individual with the same age and vocational background as Thompson who: (1) could lift no more than 10 pounds with his dominant hand or arm; (2) could stand and sit for six hours out of an eight hour workday; (3) could not climb ladders, ropes, or scaffolds; (4) could occasionally reach with the dominant hand; and (5) could not perform jobs requiring literacy, but who could perform simple mathematics calculations including telling time and simple addition and subtraction.  (Tr. 206-207).  The VE testified that such an individual could not perform Thompson's past work but could work as a light guard, light cashier, or light cleaner.[2]  (Tr. 206-207).

The ALJ then asked the VE to consider the same individual and to add a sit/stand option.  (Tr. 207).  The VE testified that the addition of a sit/stand option would reduce the number of cashier jobs and guard jobs by 50 percent, and it would eliminate the cleaning jobs.  (Tr. 207-208).

The ALJ then asked the VE to consider that the individual would be off task 20 percent of the workday due to pain or other symptoms.  The VE testified that there would be no available jobs for such an individual.  (Tr. 208).

### III.  Standard for Disability

---

[2] The VE testified that there are over a million light guard jobs, over two million light cashier jobs, and over two million light cleaning jobs in the national economy.  (Tr. 207).

8

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

9

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2. The claimant has not engaged in substantial gainful activity since April 30, 2004.

3. The claimant has the following severe impairments: residuals from injuries including post traumatic arthritis involving the right shoulder, right elbow, right wrist, right knee, and right ankle. The claimant also appears to be functionally illiterate which would tend to limit him to simple, routine jobs not requiring reading or writing (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work involving lifting no more than 10 pounds with his right arm, standing and sitting for six hour periods, only occasional reaching with the right upper extremity, and no climbing of ladders, ropes, and scaffolds. I also find that the claimant should be afforded the opportunity to sit or stand at his discretion, and that he is limited to jobs not requiring the ability to read or write or perform more than simple addition/subtraction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 14, 1958 and is presently 49 years of age, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and appears to be unable to read or write, although he is able to communicate in English and is able to perform simple mathematics (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case, especially in view of claimant's young age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1560(c),

404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2004 through the date of this decision (20 CFR Section 404.1520(g) and 416.920(g)).

(Tr. 20,21,22,24,25).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Thompson alleges that the ALJ erred in: (1) determining that Thompson's testimony regarding his pain was less than fully credible; and (2) determining that Thompson could perform the work of a guard or a cashier.  The Commissioner disputes these claims.

### A. The ALJ's Credibility Findings

The Sixth Circuit in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994), most clearly

11

stated the test which courts must use in reviewing the Commissioner's determinations of the credibility of an applicant's statements about pain and disability.  The Court reviewed the pertinent regulations at 20 C.F.R. § 404.1529 and summarized the applicable test as follows:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition;  or (2)  whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Id. at 1038-39 (quoting Duncan v. Secretary of Health and Human Servs., 801 F.2d 847, 853 (6th Cir. 1986)).  The Court specifically noted that the second part of this test is satisfied if the plaintiff satisfies either alternative after finding objective evidence of an underlying medical condition.  Thus, the test "does not require . . . 'objective evidence of the pain itself.'"  Felisky, 35 F.3d at 39 (quoting Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984)) (footnote omitted).  The Court also summarized the factors that should be considered in determining whether the established medical condition can reasonably be expected to produced the alleged disabling pain:

> (i) Your daily activities . . .
> (ii) The location, duration, frequency, and intensity of your pain . . .
> (iii) Precipitating and aggravating factors . . .
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms . . .
> (v) Treatment, other than medication, you receive or have received for relief of your pain . . .
> (vi) Any measures you use or have used to relieve your pain . . .

Felisky, 35 F.3d at 1039-40.  The Court added that "the opinions and statements of the claimant's doctors" are also relevant to the Commissioner's and the reviewing court's determination.  Id. at 1040.  Credibility determinations regarding a claimant's subjective

complaints rest with the ALJ.  *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  Moreover, the ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461,463 (6th Cir. 1987).

In the instant case, the ALJ determined that Thompson's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Thompson's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  In support of his finding, the ALJ relied upon the following evidence.

The results of diagnostic studies such as X-rays revealed adequate healing of Thompson's injuries with no serious complications other than some post traumatic arthritis.  (Tr. 23).  In May 2004, Thompson was benefitting from only anti-inflammatory medication; and in October 2004, Dr. Flanagan reported that Thompson was doing well.  (Tr. 23, 153,154).  In February 2005, Thompson had good range of motion in his right elbow, and an X-ray of his right upper extremity was unremarkable.  (Tr. 23, 151).  In August 2005, Dr. Flanagan reported that Thompson had only occasional pain and was doing well.  (Tr. 23, 169).

In April 2006, Thompson complained of increased pain on his right side; however, he was not using any narcotic medication.  Dr. Flanagan found that Thompson had good range of motion of his right shoulder but diminished range of motion of the right hip and right elbow.  (Tr. 23, 167).

In February 2005, Dr. Gordon reported that Thompson had only a slight loss of strength involving his right elbow, and very good grip in his upper extremities.

13

Thompson displayed no signs of muscle weakness or atrophy in his legs.  Thompson reported that his medications were beneficial, but he rarely used them.  The ALJ noted that Dr. Gordon's medical assessment, as well as the state agency medical consultant's assessment, were compatible with the ALJ's RFC assessment.  (Tr. 23, 157, 158-165).

In addition to the medical evidence, the ALJ noted that Thompson was able to care for his personal needs; assist his wife with chores; and mow the lawn and cut fire wood, as tolerated.  Thompson showed no signs of distress at the hearing and was able to present his case in a reasonable manner.  Thompson does not require any strong narcotics, and the medications he uses do not produce undesirable side effects.  Lastly, Thompson's medical management has been conservative since his initial injuries and surgeries.  (Tr. 23-24).

Thompson alleges that the ALJ's analysis is flawed because he did not properly assess some of the medical evidence.  First, Thompson argues that the ALJ failed to recognize certain physical limitations noted by Dr. Gordon, *i.e.*, abnormal range of motion of Thompson's upper and lower extremities and spine, degenerative changes in Thompson's hip, and right leg limp.  While the ALJ did not specifically mention these findings, he did accommodate  these limitations in his RFC by including limitations on right arm lifting and reaching, a prohibition against climbing ladders, ropes and scaffolds, and a restriction of sitting and standing including a sit/stand option.

Second, Thompson argues that the ALJ failed to address an apparent inconsistency in Dr. Gordon's report regarding Thompson's grip strength.  Thompson correctly notes that Dr. Gordon at one point states that Thompson's grip strength is abnormal, but later states in his summary that Thompson has very good grip strength

14

bilaterally.  (Tr.157).  While there may be an inconsistency in Gordon's written report, the manual muscle testing upon which the report is based indicates normal grasp bilaterally.  (Tr. 143).  Moreover, Thompson has failed to explain how a finding of abnormal grip strength would affect his RFC.

Finally, Thompson argues that Dr. Flanagan acknowledged Thompson's increased pain by prescribing Darvocet and opining that Thompson's long term arthritis limits him from strenuous or meaningful employment[3].  Dr. Flanagan did prescribe Darvocet for Thompson; however, he limited its use to those times when Thompson had breakthrough pain, and continued Thompson on his current course of therapy. Moreover, the ALJ acknowledged Dr. Flanagan's opinion regarding Thompson's limits on strenuous work and concluded that his RFC assessment was not inconsistent with Dr. Flanagan's opinion.

Based upon the foregoing, the Court finds that the ALJ properly assessed Thompson's credibility, and the ALJ's findings are supported by substantial evidence.

### B. The ALJ's Disability Determination

Thompson alleges that the ALJ erred in asking the VE to assume that Thompson could perform light work when, in Thompson's opinion, Thompson's RFC more closely fits the definition of sedentary work.[4]  Thompson argues that this error is significant

---

[3]Although the ALJ considered Dr. Flanagan's opinion regarding the level of Thompson's disability he was not required to do so as  issues of disability are reserved to the Commissioner.  20 C.F.R. § 404.1527(d), *Bass v. McMahon*, 499 F. 3d 506, 510-511 (6th Cir. 2007).

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling

because if Thompson were limited to sedentary work, he would be found disabled under the medical-vocational guidelines, commonly referred to as the "grids". Thompson's argument misses the mark.  First, Thompson retains the residual functional capacity to perform work beyond the sedentary level because he has no lifting limitation with his left arm, and he is able to sit and stand for six hours with a sit/stand option.

Moreover, the ALJ did not, as Thompson asserts, find that Thompson could perform a full range of light work.  Rather, the ALJ found that Thompson could perform a limited range of light work.  Thus, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines Rule 202.16.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

Tr. 25.

Pursuant thereto, the ALJ  asked the VE to consider an individual who, among other things, could lift no more than 10 pounds with his right arm; was limited to sitting and standing for no more than six hours with a sit/stand option; could not climb ladders, ropes, or scaffolds, and could occasionally reach with his right hand.  The VE testified

---

of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  20 CFR 404.1567(b)

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 CFR 404.1567(a)

that such an individual could perform work as a light guard or light cashier.  A VE's testimony that is based on a hypothetical question that accurately portrays the claimant's physical and mental impairments constitutes substantial evidence to support the ALJ's finding that there exists a substantial number of jobs in the national economy that the claimant can perform.  *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  In this case, the ALJ's hypothetical question accurately portrayed Thompson's limitations, and the VE's testimony based thereon constitutes substantial evidence.

Lastly, Thompson alleges that the ALJ erred in determining that there exists a significant number of jobs that Thompson can perform because the VE testified that there would be no available work for an individual who would need to be off task 20% of the workday.  Thompson's argument is without merit.  The ALJ's RFC finding, which the Court has found is supported by substantial evidence, does not include a  20% off task restriction.  Therefore, the ALJ did not error in failing to rely's on the VE's testimony that there would be no work for an individual who would be off task 20% of the workday.

17

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.                                   s/*Nancy A. Vecchiarelli*
                                                    Nancy A. Vecchiarelli
                                                    U.S. Magistrate Judge

Date: April 21, 2010